PEATROSS, J.
 

 | defendant, Chelsea M. Harrison, was convicted of aggravated second degree battery and received a suspended sentence of ten years at hard labor and was placed on four years’ active probation subject to special conditions. Defendant now appeals. For the reasons stated herein, Defendant’s conviction is affirmed.
 

 FACTS
 

 In the early morning hours of May 29, 2006, Lori Dice, while driving her car, received serious facial injuries when a round exercise weight (the type that slides onto a barbell) was thrown from an oncoming vehicle and crashed through her windshield. Subsequent police investigations indicated that the weight was thrown from a silver car occupied by Defendant, Chelsea M. Harrison, and driven by her boyfriend, Shon Brocato. On July 20, 2006, the State filed a bill of information charging the Defendant with one count of aggravated second degree battery in violation of La. R.S. 14:34.7. Defendant was tried before a judge over seven non-consecutive days between March 29, 2010, and July 19, 2010. As stated, Defendant was convicted as charged and she now appeals.
 

 This case revolves around whether or not the State presented evidence beyond a reasonable doubt that Defendant, with the requisite intent, threw the weight that crashed through Ms. Dice’s windshield and struck her in the face. Defendant testified at trial that Brocato was driving his rented silver car, she was sitting in the front passenger seat and a man named Aaron Wallace, a.k.a. “Miko,” was sitting in the back seat behind Brocato. Defendant maintains that Brocato asked Miko to hand him |2something off of the floor, that Miko complied and that Brocato threw the item out of the window. She claims that she did not see that it was a weight, nor did she actually see or hear the weight hit Ms. Dice’s windshield. The evidence presented by the State at trial contradicts the version of events presented in Defendant’s trial testimony. The various stories provided by the participants in the events leading up to the throwing of the weight are numerous, conflicting and confusing. The evidence is summarized as follows.
 

 The victim, Ms. Dice, testified that, on the evening of May 29, 2006, she, her boyfriend, Doug Johnston, and two other male friends, Robert Cheatwood and Jake Cunningham, rode in her Dodge Stratus to a party on a sandbar on the Shreveport bank of the Red River. They had been invited to the party by Cheatwood’s girlfriend Brandy Hoskins, a coworker and friend of Defendant. They parked in the parking lot above the sandbar and rode in a Dodge pickup truck down to the party. Ms. Dice indicated that she had a glass of
 
 *585
 
 wine earlier that afternoon, but that she did not drink that night. She remembered that, at some point in the evening, someone in another group claimed to have had their beer stolen and was asking to check the vehicles on the sandbar. Ms. Dice testified that, in the midst of this activity, she and Defendant had a physical altercation that “came out of nowhere” and lasted several minutes. After the fight between Defendant and Ms. Dice was broken up, altercations broke out all over the sandbar. Fearing for her safety, Ms. Dice made her way back to the parking lot in another friend’s truck and got back in her car with her boyfriend.
 

 liiMs. Dice and her boyfriend drove out of the parking lot and proceeded south on Clyde Fant Parkway toward the E. 70th Street exit. Her boyfriend was driving the car. Ms. Dice further testified that, once they were on E. 70th Street, a silver or white car in which Defendant was a passenger pulled up beside Ms. Dice’s car. Ms. Dice stated that she saw Defendant, who was sitting in one of the passenger seats, but assumed that, because she was not driving, there was another occupant of the vehicle. While on E. 70th Street, the silver car rammed Ms. Dice’s car. Ms. Dice called her parents and told them they were being chased. She also testified that, as the chase proceeded down E. 70th Street, the car in which Defendant was riding passed by them. Ms. Dice’s boyfriend then turned left onto Millicent Way to go toward Ms. Dice’s home in the University Terrace neighborhood. When they arrived at Ms. Dice’s home, she and her boyfriend exited her car and observed the silver car in which Defendant was riding drive by Ms. Dice’s house. Ms. Dice’s mother stated that they would need the license plate number on the silver car and, against her mother’s wishes, Ms. Dice reentered her car to try and locate the silver car in the neighborhood.
 

 On Turtle Creek Drive, Ms. Dice saw taillights ahead as the car turned around and headed back in her direction. As the cars were about to pass each other, Ms. Dice turned her head to the left to try and read the license plate as the silver car passed. At that moment, she was struck on the right side of her face and blood began to pour into her eyes. Ms. Dice was able to see the reflection of taillights come to a stop. She testified that she |/eared what they might do to her so she drove herself home. Ms. Dice stopped the car in the street in front of her house where, just before losing consciousness, she told her mother she had been shot.
 

 Mr. Johnston, Ms. Dice’s boyfriend, testified that he had accompanied her to the sandbar on the night of the incident. He witnessed the fight between Ms. Dice and Defendant, although he did not know exactly what had started the altercation. He testified that he was driving Ms. Dice’s car as they left the Hamel’s Memorial parking lot and proceeded toward Ms. Dice’s home. Mr. Johnston stated that, on E. 70th Street, a car pulled up beside them and rammed their car twice. He testified that Defendant was hanging out of the window, but Mr. Johnston could not hear what she was yelling. Mr. Johnston took a left on to Bert Kouns Industrial Loop, proceeded through the intersection at Youree Drive and took a left onto Millicent Way. The silver car followed them down Bert Kouns, but overshot Millicent Way due to the high rate of speed at which it was traveling. In an effort to catch back up to Ms. Dice’s car, the driver of the sliver car turned left into the parking lot of the Highland Clinic, from which Millicent Way can also be accessed.
 

 Once in Ms. Dice’s neighborhood, Mr. Johnston drove directly to her home. Ms. Dice’s mother was on the phone with po
 
 *586
 
 lice when they arrived. Mr. Johnston also observed the silver car in which Defendant was riding drive by Ms. Dice’s home and recalled seeing only two individuals in the car. Mr. Johnston testified that, when Ms. Dice’s mother indicated that the police needed a license plate number, Ms. Dice re-entered her car and drove |,5off to locate the silver car. By this point, Brandy Hos-kins had arrived at Ms. Dice’s home, so Mr. Johnston got in the car with her to look for Ms. Dice. Mr. Johnston and Ms. Hoskins saw the silver car and were able to obtain the license plate number, so they returned to Ms. Dice’s home. They found Ms. Dice’s car in the middle of the road and saw Ms. Dice with blood all over her face.
 

 Two Shreveport police officers responded to the disturbance call at Ms. Dice’s home and arrived to find Ms. Dice lying on the ground being attended by fire department personnel. The officers observed large amounts of blood and that the victim’s injuries were to her face. Officer L.B. Pittman testified to the contents of his report that he had recovered a three-pound weight from the driver’s side floorboard of Ms. Dice’s car.
 

 As a result of the attack, Ms. Dice suffered a broken cheek and jaw bone, a broken nose and loss of vision in her right eye. She has undergone numerous surgeries, including 4 facial reconstruction surgeries and an eye surgery, during which she has had 5 plates and 22 screws implanted in her face. She has had to have the orbital floor of her right eye “replaced” twice. Ms. Dice, who had just graduated from high school, was unable to attend college the next year while she recovered from her injuries.
 

 Two days after the incident, Defendant, Brocato and Brocato’s roommate, Steven Terry, appeared at the Shreveport Police Department with attorney Edward Mouton to give statements. They were interviewed by Detective Jeff Brown to whom the case had been assigned. Detective Brown testified that Terry was questioned first and initially claimed that he |fihad been with Defendant and Brocato on the night of the incident. Terry, however, recanted when he learned the extent of the injuries suffered by Ms. Dice and when the inconsistencies in his story made it evident to Detective Brown that Terry had not in fact been in the vehicle. Terry subsequently stated that Brocato and Defendant had asked him to give a statement that he had been with them on the night of the incident. When questioned about whether Defendant had thrown the weight from the car, Terry dropped his head and did not respond. Terry was arrested on a charge of obstruction of justice. While Terry was being booked, Detective Brown overheard Defendant comforting Terry by telling him that “[Terry] was just trying to help us out.”
 

 Detective Brown next interviewed Bro-cato. Brocato began relating the same story that Terry had given,
 
 ie.,
 
 that Terry had been in the car with him and Defendant. Once Brocato was informed that Terry’s story had “fallen apart,” however, Brocato confessed that he had been driving the car and had weights in the back of his car from having moved earlier. Broca-to also admitted that he rammed into Ms. Dice’s ear during the chase on E. 70th Street. Finally, we note that the report of Detective Brown reflects that Brocato stated that Defendant had thrown the weight out the window. Brocato was charged with aggravated property damage as a result of his intentionally ramming Ms. Dice’s car with his own.
 

 Based on the interviews of Brocato and Terry, Detective Brown informed Defendant that she would be arrested on a charge of aggravated assault. She was
 
 *587
 
 read her
 
 Miranda
 
 rights after which, on the advice of |7Mr. Mouton, Defendant made a statement limited to what happened at the sandbar and concluding at the point where she got in Brocato’s car to leave.
 

 At trial, Detective Brown was cross-examined extensively on why he failed to investigate the presence of a Jonathan Frye who had been identified as a potential occupant of the vehicle at the time of the attack on Ms. Dice. Detective Brown explained that he had no date of birth or address by which to locate him and that Brocato, the only person in the vehicle to have made a statement, had given conflicting information about whether Frye was even in the vehicle. Defense counsel also challenged Detective Brown’s failure to have the weight dusted for prints and failure to conduct any testing regarding the flight path of the weight. Detective Brown testified that the weight had been in Brocato’s car for several days and could have had multiple fingerprints on it. The weight also had blood and glass fragments on it. For these reasons, Detective Brown testified that a dusting for prints would have been unreliable.
 

 Frye did, however, testify at trial and related that he had been at the sandbar that evening with his brother Byron. Frye was a friend of Defendant’s and had come to celebrate her birthday. He testified that he was not in the car with Broca-to and Defendant when they left the sandbar. The next time he saw them after they left the sandbar was at Brocato’s home later that morning when Brocato pulled up in his now “damaged” car. On cross-examination, Frye testified that Miko was a friend of his. He said that sometime during October 2006, he and Miko got in a fight at Miko’s home; and, because Frye was without transportation, he had called Defendant and | 8asked her to come to Miko’s home and get him. Frye testified that Defendant played on his anger at Miko and convinced him to go to her attorney’s office and state that Miko had been in the car with Brocato and Defendant on the evening that the weight was thrown. Frye agreed and relayed this information to defense counsel at his office on October 26, 2006. At trial, Frye maintained that his statement to defense counsel that Miko was in the car with Brocato and Defendant was untrue. He testified that he did not see Miko at all the night of the incident, much less in the car with Defendant and Brocato.
 

 Brocato also testified against Defendant at trial as part of a plea agreement in which the State allowed him to plead to simple criminal damage to property for the damages to Ms. Dice’s car. He acknowledged that he had two prior felony convictions for simple burglary and illegal possession of stolen things. Regarding the instant offense, Brocato testified that Defendant and some of her friends had been celebrating her birthday on the sandbar. Brocato joined the group at approximately 2:30 a.m. He testified that there were approximately 30 people on the sandbar that morning, including individuals unknown to him and to Defendant, and that it was apparent to him that Defendant, among others, had been drinking.
 

 Brocato testified that, within 30 minutes of his arrival, a dispute arose when one of Defendant’s male friends complained that someone had stolen his beer. For reasons not entirely clear from Brocato’s testimony, while the parties were arguing about the beer, Ms. Dice allegedly cursed Defendant and a fist fight ensued between the two young women. Brocato further | ¡testified that, while trying to separate the girls, he was struck with a beer bottle and a pipe. Brocato then stated that he, Defendant, Miko and a fourth individual got
 
 *588
 
 in his car and left the scene. According to Brocato, as he pulled onto Clyde Fant Parkway, he passed the car occupied by Ms. Dice and being driven by her boyfriend, Mr. Johnston. Brocato testified that he and Mr. Johnston engaged in a cat and mouse game during which they attempted to run each other off the road. Brocato admitted that, at one point, he rammed Ms. Dice’s car with his car. He also testified that, during the chase, Defendant was angry and was hanging out the window screaming at Ms. Dice. As previously mentioned, the chase eventually led the parties into the University Terrace neighborhood of Shreveport.
 

 Brocato further testified that, while driving in the neighborhood, he turned onto a street that ended in a cul-de-sac forcing him to turn around. As he drove away from the cul-de-sac, he met Ms. Dice’s oncoming car. Brocato testified that he believed the driver of the vehicle was trying to block his exit. At this point in his testimony, Brocato stated that Defendant was seated behind him in the rear passenger seat. According to Brocato, as they passed Ms. Dice’s car, he saw out of the corner of his eye Defendant throw something out the window. He then heard glass shatter and Defendant screaming at him to “go, go, go.”
 

 Brocato then testified that he drove to Bossier City to drop off one of the other occupants of the car, and then he and Defendant went to his home. Brocato admitted that he and Defendant then recruited Terry, Brocato’s |,0roommate at the time, to lie to the authorities by claiming to have been in the car with them.
 

 Also during his testimony, Brocato identified two letters that Defendant had written to him while he was incarcerated. In the letters, Defendant makes arguably incriminating statements. The first letter is dated December 26, 2006, and reads as follows:
 

 I just left ccc and I was going to put this letter in the mail and I just wanted to tell you again how sorry I am. I promise I will stay out of your way from now on. This way I can’t hurt you anymore. Please believe me when I say I love you and never meant for any of this to happen. You were right on everything you said. I’m a sorry excuse for a person. Somehow I’m going to fix that.
 
 I really hate that your haviny to pay the price for my mistakes. Thats why I want you to siyn the papers against me.
 
 I know your not doing it inspite of me. That was my mistake and so I deserve whatever happens. I love you and see that I need to suck it up and take one for the team, (even though I know we won’t be together again) Thats OK.
 
 I’ve screwed up and now I need to accept responsibility for my actions whatever the consequence may be.
 
 I’m trying not to be selfish and to think of others. So you can have whats left of me. This way I can start out fresh as a different person.
 
 You need to tell the D.A. that you want him to lift your parole violation since you did nothing wrong.
 
 Your giving him all the evidence he needs to satisfy Lori and her family. Plus this will make a good new story. Its what everyone wants. Then you can be home with your Family.
 
 Sign the paper, please, so I can own up to my mistakes.
 
 I promise I won’t write you or come see you anymore. I can’t promise that I won’t ever think about you, but hey life isn’t fair so I just have to go with that. Please just do this so I can make this right and close this chapter of my life. I pray GOD will touch your heart and bring you joy with the rest of your life. I wish you the best.
 

 Chelsea Harrison
 

 
 *589
 
 I sent you some Christmas money. Don’t spend it all at one time.
 

 (Emphasis added.)
 

 In the second letter, date unknown, Defendant wrote in pertinent part: “I’m really sorry I got you put in that place.”
 

 | n Steven Terry also testified at trial. Terry stated that he had been at the sandbar when the fight broke out, but that he went straight home from the sandbar. He remembered numerous vehicles leaving at high rates of speed, including Brocato’s car. Terry further testified that Brocato and Defendant returned to Broeato’s house later and that Brocato’s car was “beat up.” He testified that Defendant told him that she had thrown a weight out the window. Nevertheless, Terry agreed to go with Defendant and Brocato to the police station and tell police that he had been in the car and that no weight was thrown from it. According to Terry, however, when the officer questioning him showed him pictures of the injuries suffered by the victim, he realized that he should tell the truth about not being in the car. Finally, Terry acknowledged that, in exchange for his truthful testimony, the obstruction of justice charge pending against him was to be dismissed.
 

 The defense presented the testimony of Laura Whitlock, who was qualified as an expert in the field of physics. Whitlock had performed various tests intended to recreate the throwing of the weight that caused the injuries to Ms. Dice. Based on the results of various recreation-type tests, Whitlock opined that it would have been very difficult for someone of Defendant’s size to have thrown the weight while hanging out the window of the front passenger seat. Given the motion of the vehicles and the fact that the weight would have to travel over the car in which Defendant was riding, Whitlock testified it would have been very difficult to time with any degree of accuracy. On the other hand, Whitlock testified that, if the weight li2were to be thrown out of the driver’s side of the car, it would have been almost impossible to miss its target of an oncoming vehicle’s windshield.
 

 Holly Santoro and her husband, Clarence Banks, also testified on behalf of Defendant. Both witnesses stated that they were on the sandbar celebrating Defendant’s birthday when Defendant and Ms. Dice started fighting. While neither San-toro nor Banks had ever met Miko before, they each testified that, when Brocato and Defendant were “chased” out of the parking lot, Miko was sitting in the back seat of their car. Neither one of them had any knowledge about what happened later because they remained at the sandbar to protect their campsite and speak to police about the alleged brandishing of a weapon by another individual. When cross-examined as to why she had not supplied Miko’s name to police in identifying witnesses, Santoro offered only that Miko had already left when the weapon was brandished. She admitted, however, that she had supplied the names of Defendant and Brocato who also could not have been present at the time of the brandishing of the weapon under Santoro’s description of events.
 

 Next, Defendant took the stand in her own defense. She testified to the same basic fact scenario which gave rise to the exodus from the Hamel Memorial parking lot. She stated that, when she and Broca-to got in the car to get away, Miko, who had been brought to the party by Frye, jumped in the back seat. She said that people were swarming the car so she yelled at Brocato to “Go, go. Run them over. Just go.” Defendant further testified that, after they left the sandbar, they were chased by several different vehicles, including Ms. Dice’s car and a blue truck.
 
 *590
 
 According to 113Pefendant, the truck followed them into the Highland Clinic parking lot which, in turn, led Brocato to drive into the University Terrace neighborhood and pass directly in front of Ms. Dice’s house. Defendant adamantly testified that she was unaware that Ms. Dice lived in University Terrace and there was no reason for Brocato to have turned into the neighborhood. She maintained that ending up in that location was strictly coincidental. Once in the neighborhood, they found themselves on several dead-end streets requiring them to turn around. Defendant explained that, after turning around on one of the streets, they were met by the headlights of the car driven by Ms. Dice. As previously mentioned, Defendant claims that, prior to the cars passing each other, Brocato asked Miko to hand him something off the floorboard in the back seat. She then saw something being passed between the two men and then saw Brocato’s “arm go up.” Defendant testified that, despite this behavior, she was unaware until the next day that Brocato had thrown a weight out the window or that anyone had been injured as a result.
 

 Also in her testimony, Defendant denied having asked Terry to lie on her behalf and explained her statement to him at the police department (that Terry was just trying to help them out) as an effort to comfort him because the police were being mean to him. She admitted that she had picked Frye up after he and Miko had had a fight, but denied that she had asked Frye to fabricate a story about Miko being in the car with Defendant on the night of the incident. When asked to explain why Frye would testify to that effect, Defendant asserted that Frye was protecting his friend Miko.
 

 1^Defendant was also questioned about her ongoing romantic relationship with Brocato. Defendant was still in a relationship with Brocato at the time of trial. The couple had a child together shortly after the instant incident and, at the time of trial, Defendant was pregnant with a second child of Brocato’s. When asked why she was still living with Brocato even though, according to her, he was trying to frame her with a felony conviction, she testified that she had no choice. Defendant testified that she had a child, was pregnant with another and needed a place to live. As to why she again became pregnant by Brocato, Defendant stated that she felt obliged to have sex with him because he provided her a place to live. In explaining her letters to Brocato, Defendant testified that her claims of feeling responsible arose strictly from the fact that the party at the sandbar was her idea and that Brocato had not wanted to go to the sandbar on the night of the incident.
 

 Prior to rendering its verdict, the trial judge reviewed his findings of fact. Citing the eyewitness testimony of Brocato and the testimony of Terry regarding Defendant’s admission, the judge found that the State had proven beyond a reasonable doubt that Defendant had in fact been the individual who threw the weight out of the car. The judge made no mention of Defendant’s failure to tell police her exculpatory version of events prior to trial. The judge further found that Defendant’s actions had caused the victim serious physical injuries. In addition, the judge concluded that there had been an effort by Defendant to “cover up” what had actually taken l1splace. Based on the foregoing, the trial judge found Defendant guilty as charged. A motion for post-verdict judgment of acquittal was denied.
 

 Defendant was sentenced on August 9, 2010, to ten years at hard labor, suspended, with four years’ active supervised probation subject to the following special con
 
 *591
 
 dition: six months in the parish jail, credit for time served; payment of restitution to the victim for any medical expenses; payment of a $500 fine and court costs; no contact with the victim; a psychological evaluation; and, if necessary, psychological treatment. This appeal ensued.
 

 DISCUSSION
 

 Defendant raises the following two assignments of error on appeal:
 

 Assignment of Error Number One (verbatim):
 
 The prosecution violated Chelsea M. Harrison’s Fifth Amendment rights when it intentionally introduced evidence of her post
 
 -Miranda
 
 assertion of her right to remain silent to impeach her trial testimony.
 

 Assignment of Error Number Two (verbatim):
 
 There was insufficient evidence to prove that Chelsea M. Harrison was guilty beyond a reasonable doubt of the offense of aggravated second-degree battery.
 

 Sufficiency of the Evidence
 

 Defendant argues that the evidence was insufficient to prove that she threw the weight out of Brocato’s car; and, even if she did throw the weight, Defendant argues that the State failed to prove that she had the requisite intent to inflict serious bodily injury. We disagree.
 

 When more than one assignment of error is raised on appeal, including the sufficiency of the evidence, the reviewing court should first determine the sufficiency of the evidence.
 
 State v. Hearold,
 
 603 So.2d 731 |1fi(La.l992);
 
 State v. Bosley,
 
 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347,
 
 writ denied,
 
 97-1203 (La.10/17/97), 701 So.2d 1333.
 

 The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);
 
 State v. Tate,
 
 01-1658 (La.5/20/03), 851 So.2d 921,
 
 cert. denied,
 
 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004);
 
 State v. Carter,
 
 42,894 (La.App.2d Cir.1/9/08), 974 So.2d 181,
 
 writ denied,
 
 08-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 05-0477 (La.2/22/06), 922 So.2d 517;
 
 State v. Dotie,
 
 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833,
 
 writ denied,
 
 09-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to the trier of fact’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Eason,
 
 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685,
 
 writ denied,
 
 09-0725 (La.12/11/09), 23 So.2d 913;
 
 State v. Hill,
 
 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758,
 
 writ denied,
 
 07-1209 (La.12/14/07), 970 So.2d 529.
 

 117The
 
 Jackson
 
 standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime.
 
 State v. Sutton,
 
 436 So.2d 471
 
 *592
 
 (La.1983);
 
 State v. Speed,
 
 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582,
 
 writ denied,
 
 09-0372 (La.11/6/09), 21 So.3d 299;
 
 State v. Parker,
 
 42,311 (La.App.2d Cir.8/15/07), 963 So.2d 497,
 
 writ denied,
 
 07-2053 (La.3/7/08), 977 So.2d 896.
 

 Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency.
 
 State v. Speed, supra; State v. Allen,
 
 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622,
 
 writs denied,
 
 02-2595 (La.3/28/03), 840 So.2d 566, 02-2997 (La.6/27/03), 847 So.2d 1255,
 
 cert. denied,
 
 540 U.S. 1185, 18124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). In the absence of in ternal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion.
 
 State v. Gullette,
 
 43,032 (La.App.2d Cir.2/13/08), 975 So.2d 753;
 
 State v. Burd,
 
 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219,
 
 writ denied,
 
 06-1083 (La.11/9/06), 941 So.2d 35. This includes the testimony of accomplices. An accomplice is a competent witness to testify against her coperpetrator even if the prosecution offers her inducements to testify; these inducements weigh on the witness’s credibility.
 
 State v. Jetton,
 
 32,893 (La.App.2d Cir.4/5/00), 756 So.2d 1206,
 
 writ denied,
 
 00-1568 (La.3/16/01), 787 So.2d 299. The credibility of an accomplice’s testimony is not within the province of the court of appeal to decide.
 
 Id.
 
 Rather, credibility evaluations are within the province of the trier of fact.
 
 Id.
 
 The fact finder is charged with making a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness. The reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law.
 
 State v. Casey,
 
 99-0023 (La.1/26/00), 775 So.2d 1022,
 
 cert. denied,
 
 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
 

 La. R.S. 14:34.7(A) defines aggravated second degree battery as “a battery committed with a dangerous weapon when the offender intentionally inflicts serious bodily injury.” The statute defines “serious bodily injury” as “bodily injury which involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death.”
 

 Aggravated second degree battery is a crime requiring specific criminal intent.
 
 See State v. Fuller,
 
 414 So.2d 306 (La.1982). Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow 119his act or failure to act. La. R.S. 14:10(1). Such state of mind can be formed in an instant.
 
 State v. Cousan,
 
 94-2503 (La.11/25/96), 684 So.2d 382. Specific intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of defendant.
 
 State v. Graham,
 
 420 So.2d 1126 (La.1982).
 

 In the case
 
 sub judice,
 
 we find the evidence that Defendant threw the weight with the requisite intent to cause serious bodily harm to be sufficient to support the conviction. First, Brocato, who was driving the car, testified that Defendant was “hanging out” of the back seat driver’s side window when she threw the weight at Ms. Dice’s car. According to Brocato, Defendant then yelled at him to “go!” Second, Terry testified that Defendant told him that she had thrown the weight and that she had asked him to participate in a scheme to cover up what had actually hap
 
 *593
 
 pened. In addition, just days following the incident, when questioned by Detective Brown about whether Defendant had thrown the weight, Terry simply dropped his head and did not speak. Third, Frye testified that Defendant attempted to enlist his help in fabricating a story that would cover up her involvement as well. Fourth, the letters authored by Defendant to Brocato speak volumes as to Defendant’s self-proclaimed wrongdoing and attendant feeling of responsibility. The trial judge clearly discredited Defendant’s explanation of the meaning of her written words and we find no abuse of discretion in his credibility determination. Moreover, Defendant’s apology
 
 via
 
 telephone to her friend Ms. Hoskins also supports a finding of culpability on the part of Defendant.
 

 12nSpecificalIy regarding the credibility determinations made by the trial judge as fact finder in this case, we note that all of the participants in the events of that evening who testified at trial are subject to credibility attacks based on their respective criminal histories. The trial judge, however, was in the unique position to hear the live testimony and weigh that testimony taking into consideration the factors affecting the credibility of each witness. After reading the transcript in its entirety, we cannot conclude that the trial judge was anything but sincere and justified in the credibility calls he made regarding the witnesses’ testimony in the case. The trial judge believed Brocato and found corroborating evidence in the testimony of Detective Brown, Terry, Frye and others. He found incredible the testimony of Defendant and those who testified on her behalf.
 

 Defendant argues that she could not have thrown the weight because she was sitting in the front passenger seat; and, according to Ms. Whitlock’s testimony, it would have been very difficult for the weight to have been thrown with any precision from the passenger side of the car. While we do not find what seat Defendant was sitting in when the weight was thrown to be determinative, we note that both Ms. Dice and Johnston testified that there were only two people in the car in which Defendant was riding. Brocato testified that Defendant was sitting behind him in the back seat on the driver’s side and did not move around during the chase. The only people who unequivocally placed Defendant in the front seat of the car were Defendant, her friend Holly Santoro and her friend’s husband, Eddie Banks. Assuming that the trial judge found the testimony of the latter two to be |⅞1 credible, their testimony only placed Defendant in the front seat of the car as the parties left the Hamel’s Memorial parking lot. The same is true with Ms. Dice’s testimony that Defendant was in the “passenger seat” when the group of vehicles sped out of the parking lot and turned onto E. 70th Street. Regardless of where Defendant was sitting in the car at any given moment, it is apparent that the trial judge, without making a specific finding as to where Defendant was sitting in the car, credited the scenario where Defendant threw the weight from the car; and, again, we find that there is sufficient evidence in this record to support that conclusion.
 

 As to whether the evidence was sufficient to establish the specific intent requirement of the crime, the court need only find that the specific intent to inflict serious bodily injury could be inferred from the circumstances of the actions of the defendant.
 
 State v. Graham, supra.
 
 We conclude that the specific intent to cause serious bodily injury could be reasonably inferred solely from the act of hurling a weight out of the window of a moving car and toward the windshield of
 
 *594
 
 another car. This conclusion is bolstered by the admission of Defendant that the two young women had engaged in a physical altercation and vehicular chase shortly thereafter. There is no question that Defendant’s emotions were high and that she was enraged at the victim. Moreover, Brocato testified that Defendant was hanging out of the window screaming at Ms. Dice’s car as the cars sped down E. 70th Street. The totality of the circumstances supports the reasonable inference of specific intent.
 

 |22In summary, we conclude that the record contains sufficient evidence to support the conviction of Defendant for second degree aggravated battery.
 
 [1]
 

 Violation of Fifth Amendment Right
 

 Defendant argues that the State’s reference to her post-Miranda silence during her trial testimony and during closing arguments exploited her invocation of her Fifth Amendment rights in derogation of the Supreme Court’s holding in
 
 Doyle v. Ohio,
 
 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The State does not argue that a
 
 Doyle
 
 violation did not occur, but simply that, to the extent one may have occurred, it was harmless error.
 

 During the State’s cross-examination of Defendant, the following exchanges occurred in regard to Defendant’s pre-arrest silence and omissions from her post-Mi
 
 randa
 
 statement made to police on the day of her arrest:
 

 Q. So once you know that Shon Broca-to has thrown this, you did some severe damage to someone’s face, you realize Aaron Wallace is involved in handing the weight, at no point — at any point, do you think that maybe you should do the right thing and tell the police who actually threw the weight?
 

 A. Yes, sir.
 

 Q. Why did you never do that?
 

 A. I was told by Edward Mouton not to say anything.
 

 |23MR. STROUD: Your Honor, I’m going to object to this. She was advised of her rights, and she agreed not to make a statement. He’s going into that. It’s perfectly legitimate what she did, and to suggest that there is something wrong isn’t proper.
 

 MR. BROUSSARD: Mr. Stroud, is incorrect for two obvious reasons, one, he opened the door into it about her conversation with Mr. Mouton on direct examination, and, secondly, because she did give a statement to the police. She did not invoke her Fifth Amendment rights. She tried to tell the police everything that allegedly happened at the sandbar and all of this other stuff. So her Fifth Amendment was not invoked. And third, on direct examination she testified that she had not yet retained Mr. Mouton at that time.
 

 MR. STROUD: Your Honor, that’s in error. The only thing she said was what was going on at the sandbar, and then she clearly invoked her rights. And for this prosecutor to go into that is improper. She asserted her Fifth Amendment privilege. There’s no assumption whatsoever that you can draw from that, and
 
 *595
 
 to quiz her why she didn’t tell the police, oh, by the way, after she was arrested was improper, because she was arrested down there that day. When she was arrested, out of the blue, she then invoked her rights, and Mr. Mouton did not represent her.
 

 MR. BROUSSARD: Your Honor, I believe it’s clear from direct examination what happened.
 

 THE COURT: I will overrule the objection, but I will also instruct you not to pry into privileged information between attorney-client.
 

 MR. STROUD: Judge, I would note my objection for the record.
 

 THE COURT: So noted for the record.
 

 BY MR. BROUSSARD:
 

 Q. So in giving your — while you are giving this statement in the police office, and you are telling them what happened at the sandbar, and you’re claiming that you had nothing to do with throwing the weight, why at some point did you not say l^what had actually happened, who was actually in the car.
 

 MR. STROUD: Objection, Your Honor. After she said that, she specifically said that, she specifically asserted her right to counsel. And after she asserted her right to counsel, you can’t go into that. The reason she didn’t say it is that upon advice of counsel, she stopped after the sandbar.
 

 MR. BROUSSARD: Your Honor, Mr. Stroud is attempting to testify into the record.
 

 MR. STROUD: I am reading from the same transcript that he is. Ms. Harrison asserted her Fifth Amendment privilege. That was the whole — that was the groundwork for the statement. Mr. Mouton said she would talk about what happened on the sandbar only, and once that ends, it’s over.
 

 MR. BROUSSARD: I believe, A, that has been ruled on; but, B, that’s not in the record; and, C, I believe that the testimony was that Mr. Mouton was not representing her at this time.
 

 THE COURT: All right. You can rephrase your question.
 

 MR. BROUSSARD: Sure, Actually, I’ll just move on.
 

 BY MR. BROUSSARD:
 

 Q. Why, when you are telling the story about the sandbar, before you allegedly invoked your Fifth Amendment against incrimination, when you are telling the story about the sandbar, why did you not once, not once mention Aaron Wallace’s name?
 

 A. I didn’t know who he was.
 

 During the State’s closing argument, the district attorney made the following references to Defendant’s failure to identify the alleged third occupant of the vehicle:
 

 Jonathan Frye also testified in this trial as well and stated that he was asked by Chelsea to go to defense counsel’s office and to lie to defense counsel to bolster her story. This came out on the stand that’s what he was asked to do.... But what’s interesting is that nothing ever comes out of Chelsea’s mouth ^regarding Shon Brocato throwing the wait [sic] until the day of her trial, when he is already done with his part of the trial.
 

 [[Image here]]
 

 It seems like it would make a lot more sense if her story was true that you would point to the person you don’t know as the guilty one, the person that you don’t have any reason to want to protect, that this person, Miko, is someone she claims she doesn’t even know, and it’s very interesting that at no point
 
 *596
 
 in the investigation did she indicate he was in the car.
 

 [[Image here]]
 

 She also gave a statement about what happened at the sandbar, but nowhere in the statement about the sandbar did she say, oh, this guy, Miko, left with us in the car or this other third individual left with us in the car. I think what’s important is, if there was a third witness here in the car, a third person, who is going to say, I saw who threw the weight, it was Shon Brocato, why in the world has his name never come out in this investigation?
 

 The use for impeachment purposes of a defendant’s silence at the time of arrest and after receiving
 
 Miranda
 
 warnings violates the Due Process Clause of the Fourteenth Amendment.
 
 Doyle, supra.
 
 In
 
 Doyle,
 
 the Supreme Court explained:
 

 [Wjhile it is true that the
 
 Miranda
 
 warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person’s silence to be used to impeach an explanation subsequently offered at trial.
 

 The Due Process Clause, however, does not prohibit impeachment using a defendant’s pre-arrest silence,
 
 Jenkins v. Anderson,
 
 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), or his post-arrest, pre-
 
 Miranda
 
 silence.
 
 Fletcher v. Weir,
 
 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982).
 

 12(jln
 
 Jenkins, supra,
 
 the prosecutor attempted to impeach the defendant’s credibility regarding his claim that he had killed in self-defense by suggesting that the petitioner would have reported the killing immediately. Defendant contended that the prosecutor’s actions violated the Fifth Amendment as applied to the states through the Fourteenth Amendment. Finding that the
 
 Doyle
 
 protections do not attach in the absence of the sort of affirmative assurances embodied in the
 
 Miranda
 
 warnings, the court concluded that the use of pre-arrest silence to impeach a defendant’s credibility did not deny him the fundamental fairness guaranteed by the Fourteenth Amendment. Furthermore, the court made it clear that, by taking the stand and exposing himself to cross-examination, “a defendant waives any Fifth Amendment privilege he may have against the use of his prearrest silence for impeachment purposes.”
 
 Jenkins, supra.
 
 The court in
 
 Jenkins
 
 then noted the common law practice allowing the impeachment of witnesses by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted.
 
 Id.
 

 As has been noted by the Louisiana Supreme Court, our courts have followed this tradition of allowing the substantive use of a defendant’s silence as a tacit admission under certain circumstances recognizing that “aside from the privilege against compelled self-incrimination ... in proper circumstances silence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause.”
 
 State v. Richards,
 
 99-0067 (La.9/17/99), 750 So.2d 940.
 

 | j>7In
 
 Anderson v. Charles,
 
 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980)
 
 (per
 
 curiam), the Supreme Court declined to extend
 
 Doyle
 
 to a situation in which the defendant did not invoke his
 
 Miranda
 
 rights, but waived them and gave a post-arrest statement inconsistent with his trial testimony. A defendant who voluntarily speaks after receiving
 
 Miranda
 
 warnings has not been induced to remain silent. If a defendant tells different stories during
 
 *597
 
 post-arrest questioning and at trial, the prosecution may properly inquire into the prior inconsistent statements, even though the prior statements involve “silence” insofar as they omit facts contained in the later story.
 
 Anderson v. Charles, supra.
 

 In addition, the
 
 Doyle
 
 proscription against referring to a defendant’s post-arrest silence is not without exceptions. The state is allowed to reference the defendant’s post-arrest silence when the evidence of post-arrest silence is relevant to rebut a defense-raised assertion that the arresting officers failed to properly investigate or that the defendant actively cooperated with the police when arrested.
 
 State v. Bell,
 
 446 So.2d 1191 (La.1984).
 

 A
 
 Doyle
 
 error is subject to a harmless error review.
 
 Brecht v. Abrahamson,
 
 507 U.S. 619, 113 S.Ct. 1710, 128 L.Ed.2d 353 (1993). The harmless error inquiry is “whether the guilty verdict actually rendered in this trial was surely unattributable to the error.”
 
 Sullivan v. Louisiana,
 
 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
 

 A review of Defendant’s cross-examination by the district attorney and references to Defendant’s silence in the closing argument are not ^unequivocal references to Defendant’s
 
 post-Miranda
 
 silence. In fact, the district attorney’s first question about Defendant’s failure to tell the police about the events of that evening is specifically qualified by a reference to Defendant’s failure to “at any point” tell the police who actually threw the weight. Defendant testified to a version of events in which she and her boyfriend were the victims of several batteries committed with beer bottles and lead pipes after which they were chased by numerous vehicles through the streets of Shreveport at high rates of speed and that she was not aware until the next day that a weight had even been thrown or that anyone had been injured. Under these circumstances, a reasonable conclusion would be that an ordinary person would have reported these events to the authorities immediately upon their occurrence. Under the above-cited jurisprudence, the State would be entitled to impeach Defendant with the failure to do so (pre-arrest silence) before she appeared at the police station two days after the event.
 

 The subsequent questions after defense counsel’s initial objection were, however, about Defendant’s
 
 post-Miranda
 
 statement. The questions were not, however, about Defendant’s silence, but sought explanation from Defendant about the substantive differences between the statement she made to police about what happened at the sandbar and the statements she was making in her testimony. Specifically, the questions pertained to Defendant’s assertion at trial that, when she and Brocato jumped in the car to leave, an individual by the name of Miko jumped in with them. In her
 
 post-Miranda
 
 statement to Detective Brown, which was limited to the | ^events at the sandbar, Defendant referenced that “they” jumped into the car and yet did not specifically mention any other individual(s) in the car besides herself and Brocato. Defendant made a limited, yet voluntary, statement about the events at the sandbar and was impeached by the varying details provided by her in the statement to the detective and then at trial. A defendant should not be allowed to vary the details of the event during testimony while claiming the previously unspoken details are unassailable as a post-Miranda election to remain silent.
 
 Anderson v. Charles, supra.
 

 Furthermore, defense counsel’s cross-examination of Detective Brown sought to create the impression in the trial judge’s mind that the police had conducted a sloppy investigation in failing to dust the weight for fingerprints, failing to question
 
 *598
 
 witnesses who had been identified as being in the car and in failing to conduct testing regarding the flight path of the weight. The. Fifth Amendment protects a defendant’s right to remain silent; it does not protect his effort to exploit that silence by requiring the government also to remain silent. Arguably, the district attorney’s purpose in questioning Defendant about her failure to identify Brocato as the thrower of the weight and Miko as an occupant of the car was to counter the allegation that police had failed to properly develop the case.
 
 State v. Bell, supra.
 

 Assuming,
 
 arguendo,
 
 however, that a
 
 Doyle
 
 violation occurred, we find that any such error was harmless.
 
 Sullivan v. Louisiana, supra.
 
 There is a significant amount of evidence identifying Defendant as the individual who threw the weight that crashed through Ms. Dice’s windshield. The |snrecord shows that any
 
 Doyle
 
 violation did not contribute to Defendant’s conviction. Defendant’s conviction was attributable beyond a reasonable doubt not only to the witnesses against her, but to the numerous inconsistencies and unbelievable explanations by Defendant and her witnesses regarding the sequence of events that led to Ms. Dice’s injuries. The trial judge found Defendant’s testimony to be untrustworthy in its entirety. This finding was clearly attributable to the implausibility of Defendant’s version of events and not the fact she failed to provide information to law enforcement sooner.
 

 CONCLUSION
 

 For the foregoing reasons, the conviction of Defendant, Chelsea M. Harrison, is affirmed.
 

 AFFIRMED.
 

 [1]
 

 . We further note that, even if Defendant’s version of events is credited,
 
 i.e.,
 
 Brocato was the thrower of the weight, Defendant would be guilty of being a principal to the aggravated second degree battery. As the individual who had physically fought with Ms. Dice just before the crime, the person who would have likely handed the weight to Brocato and the person who was verbally encouraging the continued conflict with the victim after leaving the sandbar, we conclude that Defendant would have "also actively desired ... great bodily harm to the victim."
 
 State v. Mitchell,
 
 39,305 (La.App.2d Cir.2/17/05), 894 So.2d 1240,
 
 writ denied,
 
 05-0741 (La.6/3/05), 903 So.2d 457.