GARRETT, J.
h Following a bench trial, the defendant, Cordelro Lensey, was convicted as charged of'second degree murder. The trial court imposed the mandatory sentence of life imprisonment without benefit of parole, probation or suspension of sentence. The defendant appeals. We affirm the defendant’s conviction' and sentence.
FACTS
On September 12, 2012, the defendant shot and killed the victim, Jason Williams, aka “J Rock.” íhe defendant and another man, Kevin Dison, Jr., were at Williams’s house in Shreveport to buy marijuana. The shooting was captured by the cameras from Williams’s home security video system. On September 19, 2012, the defendant was arrested pursuant to an arrest warrant and later indicted for second degree murder.
During his bench trial in January 2015, the defendant testified and, for the first time, claimed self-defense. He maintained that Williams was accidentally killed when caught in crossfire between him and a man named Lamont Jenkins who was also pres: ent in Williams’s house. The trial judge rejected the defendant’s assertion of self-defense and found him guilty as charged. His motion for post-verdict judgment of acquittal was denied, and the trial court imposed the mandatory sentence of life imprisonment without benefit of parole, probation or suspension of sentence. On appeal, the defendant raises two assignments of error.
^SUFFICIENCY OF EVIDENCE
. In this assignment of error; the defendant eontendá that there was insufficient evidence to support his conviction for sec *1061 ond degree murder. We find no merit in this assignment of error.

Law

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable, doubt, Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Crossley, 48,-149 (La.App.2d Cir.6/26/13), 117 So.3d 585, writ denied, 2013-1798 (La.2/14/14), 132 So.3d 410. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442; State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 2009-0725 (La.12/11/09), 23 So.3d 913, cert. denied, 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010); State v. Edwards, 49,635 (La.App.2d Cir.2/26/15), 162 So.3d 512. A reviewing court accords great' deference to a trier of fact’s decision to accept or reject the testimony of a witness in whole or in part. State v. Lloyd, 48,914 (La.App.2d Cir.1/14/15), 161 So.3d 879.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of [¡¡evidence in such eases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Henry, 47,323 (La.App.2d Cir.7/25/12), 103 So.3d 424, writ denied, 2012-1917 (La.3/8/13), 109 So.3d 356.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Glover, 47,311 (La.App.2d Cir.10/10/12), 106 So.3d 129, writ denied, 2012-2667 (La.5/24/13), 116 So.3d 659; State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299.. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Glover, supra.
 A victim’s or witness’s testimony-alone is usually sufficient to support the verdict, as appellate courts will not second-guess the credibility determinations of the fact finder beyond the constitutional standard of sufficiency. State v. Davis, 2002-1043 (La.6/27/03), 848 So.2d 557. In |4the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the fact finder, is sufficient support for a requisite factual conclusion. State v. Robinson, 2002-1869 (La.4/14/04), 874 So.2d 66; State v. Edwards, supra.
Second degree murder is the killing of a human- being when the offender has a specific intent to kill or to inflict great bodily harm. La.-R.S. 14:30.1. Specific intent is -'the state- of mind which exists when ■ the circumstances indicate that the -offender actively desired the prescribed criminal consequences to follow his act or.failure to act. 'La. R.S. 14:10(1); *1062 State v. Davis, 40,382 (La.App.2d Cir.10/26/05), 914 So.2d 1129, writ denied, 2005-2419 (La.4/17/06), 926 So.2d 512. As a state of mind, specific intent need not-be proved as a fact; it may be inferred from the circumstances and the actions of the defendant. State v. Kahey, 436 So.2d 475 (La.1983); State v. Davis, supra. The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Johnson, 27,-522 (La.App.2d Cir.12/6/95), 665 So.2d 1237; State v. Lloyd, supra. The determination of whether the requisite intent is present is a question for the trier of fact. State v. Huizar, 414 So.2d 741 (La.1982); State v. Lloyd, supra.
When self-defense is raised as an issue by a defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. State v. Johnson, 41,428 (La.App.2d Cir.9/27/06), 940 So.2d 711, writ denied, 2006-2615 (La.5/18/07), 957 So.2d 150; State v. Edwards, supra. Factors to consider in determining whether a ^defendant had a reasonable belief that the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant’s knowledge of the assailant’s bad character. State v. Johnson, supra; State v. Edwards, supra.
When the defendant challenges the sufficiency of the evidence in a self-defense case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense or in the defense of others. State v. Davis, 46,267 (La.App.2d Cir.5/18/11), 69 So.3d 538, writ denied, 2011-1561 (La.1/13/12), 77 So.3d 952.

Trial Testimony

Dison was 18 years old and incarcerated on unrelated charges at the time of trial. He candidly admitted that he was scared to testify at the trial- He was granted use immunity in the instant matter in exchange for his testimony. He testified that he and the defendant were not friends. However, after he saw the defendant with a marijuana blunt on the day of the shooting, a conversation ensued between them about where to buy marijuana. At the defendant’s suggestion, they went to Williams’s house to make a purchase. Williams admitted them into the' house. Dison gave Williams $10 in exchange for some marijuana, which he placed in his pocket. Dison observed a man he did not know sitting down in the house during the transaction; the man was later identified by the police as Jenkins. Dison testified that there was no argument or any other provocation while bthey were in the house. After they exited .the house and were standing on the porch, Dison saw the defendant draw a weapon. Dison testified that he was unaware that the defendant was armed and that he had to move out of the way to avoid being shot himself. The defendant' began firing- in Williams’s direction. Dison stated that he took off running after the defendant began firing and 'that he heard at least three shots, maybe more, as he fled. Dison testified that, several days after the shooting, he gave a recorded statement to the police and picked the defendant out of a photo lineup, identifying him as the shooter. He also testified before the grand jury which indicted the defendant.
■ Marcus Mitchell, an investigator for the crime scene investigations unit of the Shreveport Police Department (SPD), testified that there were at least three bullet holes in the front door; blood streams on the back of the door indicated a person *1063 had been shot close- to the door. There were also pools and trails of blood on the floor near the door. In total, he found at least seven bullet holes in the house. Four 9 mm shell casings were recovered near the front porch of the residence, as well as a deformed expended projectile lodged in a wall. No weapons were recovered in the residence or on the victim’s person. A security camera system was found in the house. The video of the actual shooting was recovered and admitted into evidence at trial.
Detective David Bonillas, the SPD lead investigator assigned to the case, testified that he interviewed several people, including Dison and Jenkins. He corroborated Dison’s testimony about identifying the defendant 17in a photo lineup. He also testified that the murder weapon was never recovered. The only firearm located near the crime scene was a revolver found in a car parked at the house. He also corroborated the testimony that there were three penetrating bullet holes to the front door. He further noted that there were some bullet holes to the outside of a bedroom area that might have entered the inside of the house from the outside.
Dr. James G. Traylor, Jr., the 'forensic pathologist who performed the autopsy, testified that Williams was shot at least two or three times. The most fatal wound struck him in the right jaw and totally transected his left carotid artery. There was also a perforating (bullet goes in and out) wound to the upper right arm, as well as a penetrating wound (bullet goes in but not out) to the chest. Dr. Traylor indicated that these two wounds might have been caused by one bullet if Williams’s arm was raised.
Shelly Anderson, the chief deputy of the Bossier City Marshal’s office, testified as an expert in computer forensic examinations. She recovered video of the shooting from the DVR from Williams’s home security video system. The system had four cameras showing various exterior shots of Williams’s house. The video played at trial showed the defendant and Dison as they approached the front' door; where they were admitted into the house by Williams. About a minute later, the defendant and Dison left the house. While standing on the porch, the defendant furtively moved his hand to his side, pulled a gun from his-waistband, and fired several shots toward Williams. He also fired additional shots at the house as he fled.
I «The defendant, who was almost 23 years old at the time of trial, was the only witness to testify for the defense. He stated that, on the day of the shooting, he met Dison for the first time; Dison was with a friend of the' defendant’s from school. The men decided to get some marijuana and went to Williams’s house for that purpose. The ' defendant stated that he did not know Williams because he lived in a different neighborhood. After entering the house, he saw Jenkins come from a back room and sit down. He and Jenkins knew each other from school and had a violent past that included several altercations. If they saw each other, there was fighting. He and Jenkins did not exchange any words, but they just' looked at each other. The defendant testified that “we already know what it is with each other.” On cross-examination, he explained this statement as meaning that he and Jenkins already knew they had problems with each other and that a fight might occur. The defendant testified that as he walked out of the house, he saw Jenkins jump up behind Williams, acting like he was going to pull out á gun. He insisted that Jenkins actually drew a gun, “probably a revolver.” So he drew his own gun and began shooting, striking Williams in the crossfire. He then fled. He did not find out that Williams had been shot until two days later.
*1064 Detective Bonillas testified on rebuttal that there was no.evidence recovered at the scene to suggest that more than one gun was fired. As. to the revolver the police recovered from a nearby car, the detective explained that when a revolver is fired, the casings remain in it and that the recovered revolver contained neither casings nor, ammunition. The detective also ^testified that he was surprised by the defendant’s testimony claiming self-defense because no witness ever stated that Jenkins had a gun, much less fired one, that anyone except the defendant fired a gun, or that the shooting was in self-defense.

Discussion

After the bench trial, the trial judge took the matter under advisement to review her notes and the exhibits admitted into evidence. Several days later, the trial judge provided detailed oral reasons for finding the defendant guilty as charged. Thus, unlike a jury trial, we have the benefit of the trier of fact’s analysis of the evidence and credibility determinations. The trial judge found that the defendant’s actions in firing a gun three or four times at close range established his intent to inflict great bodily harm on the victim. She noted that the defendant’s account that Jenkins had a gun and pulled it out was not corroborated by any other witness or any evidence. According to the defendant, there were several people nearby who were at least acquaintances, if not friends; however, he failed to produce any of them to support his version of the shooting. Also, there was ño evidence of another gun, including a lack of shell casings.
The trial judge specifically found the testimony .of Dison — the only witness in the house to testify — to be credible, especially given his unhappiness at being called as a witness.[1] The judge concluded that he had | )|)no reason to lie. She accepted his testimony- that he was shocked that the defendant had a gun and even more shocked when the shooting began.
In subsequently denying the defendant’s motion for post-verdict judgment of acquittal, the trial court again noted the lack of evidence corroborating the defendant’s version of the shooting. She also cited the video capturing the shooting as the “most significant piece of evidence.”
The evidence presented at trial is sufficient to support the defendant’s conviction for second degree murder. The surveillance video and the testimony of the witnesses show that, as the defendant and Dison exited Williams’s house, the defendant fired several shots in the direction of Williams, and then fired several more shots at the house as he ran away. The defendant’s specific intent to kill or inflict great bodily harm was demonstrated by his act of deliberately pointing a gun in the direction of Williams and firing at least three shots from a close range.
Further, the trial court reasonably found that the defendant did not act in self-defense. At trial, the defendant testified that he pulled out his gun and fired shots because Jenkins, with whom he had a history of fighting, jumped up behind Williams, pulled out a gun, and began firing at him. However, .Dison testified that he did not see anyone else in the house with a gun and Detective Bonillas testified that there was no evidence that more than one. gun had been shot. The only evidence supporting the defendant’s claim that he acted in self-defense was his own self-serving testimony, which was not eorrobo- *1065 rated by any other witness. Niven all of the evidence, to the contrary, the trial court chose to reject the defendant’s claim of self-⅛! defense. This court does not assess the credibility of witnesses or reweigh evidence.
Considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have reasonably concluded that the defendant had the requisite specific intent to kill or inflict great bodily harm, and that he did not act in self-defense. This assignment of error is without merit.
DOYLE VIOLATION
In the second assignment of error, the defense contends that the state intentionally exploited the defendant’s invocation of his Fifth Amendment rights by using his post-Miranda silence to impeach his trial testimony that he acted in self-defense, in violation of Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

Law

In Doyle v. Ohio, supra, the United States Supreme Court held that the use for impeachment purposes of the defendant’s silence at the time of arrest and after receiving Miranda warnings violates the Due Process Clause of the Fourteenth Amendment: The decision in Doyle rests on the premise that Miranda warnings render the subsequent silence of the defendant “insolubly ambiguous,” and thereby make later use of that silence to impeach his or her exculpatory testimony at trial fundamentally unfair. State v. Richards, 99-0067 (La.9/17/99), 750 So.2d 940; State v. Grant, 47,365 (La.App.2d Cir.9/20/12), 105 So.3d 81, writ denied, 2012-2279 (La.4/5/13), 110 So.3d 1073.
|12A defendant’s due process rights are violated when a prosecutor impeaches a defendant’s exculpatory story, told for the first time at trial, by cross-examining him about his failure to have told the story after receiving Miranda warnings, at the , time of his arrest. State v. Marshall, 2013-2007 (La.12/9/14), 157 So.3d 563.
However, the Due Process Clause does not prohibit impeachment ■ using a defendant’s pre-arrest silence. Jenkins v. Anderson, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980); State v. Harrison, 46,-325 (La.App. Cir.5/18/11), 69 So.3d 581. In State v. Richards, supra, the Louisiana Supreme Court stated:
In the case of pre-arrest silence, in which “[t]he failure to' speak occur[s] before the petitioner [is] taken into custody and given Miranda warnings,” and in which “no governmental action induce[s] petitioner to remain silent,” “the fundamental unfairness present in Doyle is 'not present.” Jenkins v. Anderson, 447 U.S. 231, 240, 100 S.Ct. 2124, 2130, 65 L.Ed.2d 86 (1980): Neither Doyle specifically, nor the Due Process Clause generally, bars the inquiry. Jenkins, 447 U.S. at 239-40, 100 S.Ct. at-2129-30. In addition, Jenkins made clear; without expressly deciding “whether or -under what circumstances pre-arrest silence may be protected by the Fifth Amendment,” id., 447 U.S. at 236 n. 2, 100 S.Ct. at 2128, that by taking the stand and exposing himself to cross-examination, “a defendant waives any Fifth Amendment privilege he may have against the use of his pre-arrest silence for impeachment purposes.” Id., 447 U.S. at 235-36, 100 S.Ct. at 2127-28 (discussing Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926)). The federal constitution therefore leaves undisturbed the common law tradition which “allowed witnesses to be impeached by .their previous failure to state a fact -in circumstances in which that fact naturally would have been asserted.” Jenkins, 447 U.S. at 239, 100 S.Ct. at 2129 (citing 3A J. Wigmore, *1066 Evidence, § 1042, p. 1056) (Chadbourn rev.1970).
Further, the Doyle proscription against referring to a defendant’s post-arrest silence is not without exceptions. The state is allowed to preference the defendant’s post-arrest silence when the evidence of post-arrest silence is relevant to rebut a defense-raised assertion that the arresting officers failed to properly investigate or that the defendant actively cooperated with the police when arrested. State v. Bell, 446 So.2d 1191 (La.1984); State v. Harrison, supra.
A Doyle violation is characterized as a trial error which is subject to a harmless error analysis. The harmless error inquiry is “whether the guilty verdict actually rendered in this trial was surely unattributable to the error.” State v. Marshall, supra; State v. Harrison, supra; State v. Grant, supra.
An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. La. C. Cr. P. art. 841. The contemporaneous objection rule prevents “a defendant from gambling for a favorable verdict and then, upon conviction, resorting to appeal on errors which either could have been avoided or corrected at the time or should have put an immediate halt to the proceedings.” State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996).
In State v. Arvie, 505 So.2d 44 (La.1987), the defendant’s failure to contemporaneously object to a Doyle violation resulted in the defendant’s conviction being upheld.

Trial Testimony

During the state’s case in chief, Detective Bonillas testified about the investigation, as well as the facts and circumstances surrounding the defendant’s arrest. He explained that after the defendant was arrested and |14advised of his Miranda rights, he declined to make a statement without counsel. No objection was made by the defendant to this testimony. -
On. cross-examination of the defendant, the following exchange occurred:
Q. Okay. Did you hear Detective Bon-illas state to the Court that when you were interviewed you asked for an attorney?-
A. Yes, I did.
Defense counsel then objected, stating that it was not relevant or permissible for the state to question the defendant regarding his post-arrest silence and invocation of his Fifth Amendment right. The prosecutor argued that the defendant could be asked anything on cross-examination because he waived his Fifth Amendment right by taking the stand, and claimed that she was not asking him about why he invoked his right, but simply wanted the defendant to confirm the truth of Detective Bonillas’s statement that the defendant invoked his right to have an attorney present when the detective attempted to interview him. The defendant then declared that he had “no problem answering the question,” and the trial court overruled the objection. The exchange continued:
Q: When you met with Detective Bonil-las, you asked for an attorney to be present; is that correct, sir?
A. Yes, I did.
[[Image here]]
Q. At any time did you and [defense counsel] meet with Detective Bonillas?
| ^Defense counsel objected to this question on the basis of relevance and the attorney-client privilege. The trial court overruled the objection and the state continued with its cross-examination:
Q. Did you meet with Detective Bonil-las?
A. No, we didn’t.
*1067 Q. The information that you’ve just provided to Judge Dorroh today; have you ever provided that information to Detective Bonillas?
A. No, I didn’t.
Q._ Detective Curtis?
A. I don’t know who that is.
Q. Any police officer?
A. No, I didn’t.
Q. Any-deputy?
A. No, I didn’t.
Q. Anyone working at CCC?
A. No, I didn’t.

Discussion

 Arguably, the defense failed to preserve any Doyle issue for appellate review because, although defense counsel initially objected, the' defendant agreed to answer the question and defense counsel did not thereafter renew the objection. Nevertheless, out of an abundance of caution, we will address the claim.
The fact that the defendant chose not to make a statement to the police after his arrest was already in evidence without any objection by the | ^defense. When the issue was , raised during the cross-examination of the defendant, the state initially referenced the fact that he invoked his right' to have an attorney present when he was questioned by Detective Bonillas, and the remaining questions related to the defendant’s failure to, at any point, tell anyone his version of the events. Although the questions were permissible as to the defendant’s pre-arrest silence, the questions as to his post-Miranda silence were not.
However, such questions were arguably raised to counter allegations inferred through the defense’s cross-examination of the state’s witnesses that the police failed to properly investigate the case with respect to Jenkins also having and firing a gun. Further, to the extent that any Doyle violation may have occurred, it was harmless error and did not contribute to the defendant’s convictióh in - this bench trial. There was substantial evidence of the defendant’s guilt. The state did not refer to or rely upon the defendant’s post-Miranda silence "in closing arguments. The trial judge rejected the defendant’s self-defense claim because it was hot corroborated by any other witness or evidence. For the foregoing reasons, this assignment of error is without merit.
CONCLUSION
The defendant’s conviction and sentence are affirmed.
AFFIRMED.
BROWN, C.J., concurs with written reasons.

. When Dison was initially called to testify, he invoked the" Fifth Amendment, claiming that he was too afraid of the defendant to testify. Although he had waived the presence of his attorney, she was contacted and called to the courtroom. After they spoke and the district attorney's office gave him use immunity, Di-son finally testified,