STATE OF LOUISIANA

VERSUS

MAURICE T. LEACH AKA "MARLO"

NO. 22-KA-194

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 19-4679, DIVISION "N"
HONORABLE STEPHEN D. ENRIGHT, JR., JUDGE PRESIDING

December 28, 2022

**MARC E. JOHNSON**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Jude G. Gravois, and Marc E. Johnson

**AFFIRMED;**
**REMANDED FOR CORRECTION OF UCO**
     **MEJ**
     **FHW**
     **JGG**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

_Alexis Barteet_
Alexis Barteet
Assistant Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
 Honorable Paul D. Connick, Jr.
 Thomas J. Butler
 Andrea F. Long
 Brittany Beckner

COUNSEL FOR DEFENDANT/APPELLANT,
MAURICE T. LEACH AKA "MARLO"
 Jane L. Beebe

**JOHNSON, J.**

Defendant, Maurice T. Leach, appeals his conviction and sentence of thirty-five years imprisonment at hard labor imposed by the 24th Judicial District Court for committing manslaughter in violation of La. R.S. 14:31.  For the following reasons, we affirm Defendant's conviction and sentence.

### FACTS AND PROCEDURAL HISTORY

Defendant, Michael T. Leach, aka "Marlo", was charged with second degree murder, in violation of La. R.S. 14:30.1, and obstruction of justice, in violation of La. R.S. 14:130.1, in a bill of information filed on October 3, 2019.  The following facts were obtained from the evidence and testimony presented at trial November 8 – 10, 2021:

On May 25, 2019, Defendant shot and killed Michael Shawn Brown inside of the Pair of Dice Lounge, located on Interstate-10 Service Road South in Metairie.  The bartender called 9-1-1 twice shortly after 4:00 a.m. in the morning to report the incident.  The second time he called, he advised that the shooter, named "Marlo", was a Black male, between 5'8" and 6'0," with twists in his hair, and who wore a dark blue T-shirt and jeans.

Deputy Brian Knowles with the Jefferson Parish Sheriff's Office (JPSO) was dispatched to the lounge on May 25, 2019, at 4:08 a.m. Upon his arrival at 4:11 a.m., Deputy Knowles observed an unresponsive, male victim, later identified as Michael Shawn Brown, lying on the floor with a gunshot wound to his head. After Mr. Brown was pronounced dead at 4:22 a.m., Deputy Knowles secured the scene and spoke with witnesses. Detective Knowles indicated that he was able to determine the identity of a possible suspect known as "Marlo." He testified that no firearm was located at the scene.

Dr. Yen Van Vo, an expert in forensic pathology, performed the autopsy of Mr. Brown. Dr. Vo determined that the cause of death was a gunshot wound to the

head and that the manner of death was homicide. In Dr. Vo's opinion, Mr. Brown was shot at an intermediate range based on the stippling around the wound. She stated this distance was generally around a "few inches, three, six inches, to two feet." Dr. Vo testified that the toxicology report revealed that Mr. Brown had caffeine, nicotine, cocaine, alcohol, benzoylecgonine, and cocaethylene in his blood.[1] She testified that the victim's personal effects recovered at the scene included sunglasses, jewelry, and a pocketknife.

Detective Anthony Buttone reviewed the surveillance video from the lounge, and the video was played for the jury. He explained that the video depicted multiple camera angles from inside of the bar. While the videos played, the detective identified the individuals inside of the lounge during the incident. The detective pointed out Mr. Brown sitting at the bar. Detective Buttone identified Defendant as the individual standing by a white female named "Lisa." He indicated that Defendant was wearing light-colored pants and a dark t-shirt and that Mr. Brown was wearing a blue or dark-colored shirt. Detective Buttone explained that the video showed a witness from the scene placing his arm around Defendant. He also observed Mr. Brown walk away from Defendant and towards his original seat at the bar.

In another video, Detective Buttone described the victim as sitting at the bar next to "Ronnie [Ronald Ruiz]." He indicated that Ronnie walked over to Defendant and that Kelli McCoy walked "over to separate the two." While describing the videos, Detective Buttone denied that there was anything in Mr. Brown's hands. He stated that the other camera angles also showed that there was nothing in Mr. Brown's hands at any time during the incident.

---

[1] Dr. Vo indicated that Mr. Brown had over double the average impairment level of cocaine, and also benzoylecgonine and cocaethylene, in his system at the time of his death. The doctor explained that cocaethylene is a byproduct that is created when an individual ingests alcohol and cocaine at the same time. Dr. Vo further explained that cocaethylene potentially enhances the effect of cocaine, which the doctor acknowledged is associated with heightened levels of aggression.

Detective Buttone testified that Defendant neither returned to the scene to speak with the police nor made any contact with them. U.S Marshals apprehended Defendant in New Jersey, but did not find the weapon Defendant used to shoot Mr. Brown. In his statement to law enforcement, Defendant said he disposed of the firearm at Brother's Gas Station and Food Mart, which was a short distance from the lounge. Upon searching the gas station and surrounding area, Detective Buttone did not locate a firearm. In open court, he identified Defendant as the individual who was arrested for killing the victim.

Donald Zanotelli, now retired, was the lead JPSO detective in the homicide investigation in this case. Upon his arrival at the scene, he observed the deceased victim with a single gunshot wound to his neck on the floor. Detective Zanotelli indicated that he spoke with the remaining witnesses on the scene and developed Defendant, whom the witnesses called "Marlo," as a suspect. He learned Defendant's full name from his interviews with Ms. Monica Sonia and Ms. Kelli McCoy and discovered that Defendant was from New Jersey through social media and research. Detective Zanotelli presented a photographic lineup to Mr. Ruiz, Ms. Sonia, Ms. McCoy, and Ms. Johnson, and they all identified Defendant as the shooter.

Detective Zanotelli also identified photographs taken of individuals at the lounge. He indicated that one of the photographs captured Mr. Brown, Mr. Ruiz, Lisa, Mr. Flippin, and Defendant; another showed Mr. Brown and Ms. McCoy. The photo depicted Ms. McCoy when she was "pushed to the ground as [Defendant] was coming over and fired a single shot with the muzzle flash." In another photograph, Defendant, who was armed with a firearm, could be seen "shoving and shooting" the victim, and also showed Ms. McCoy intervening. Detective Zanotelli reviewed the video from the lounge several times during his investigation. He denied seeing Mr. Brown with a weapon in his hands or reaching

into his pockets and confirmed that Mr. Brown's hands were empty and "down to his side." No witnesses reported that Mr. Brown had a knife. A pocketknife and Bic lighter were recovered from Mr. Brown's body. Detective Zanotelli testified that Defendant did not mention a knife in the statement he gave to police. He recalled that Defendant made the allegation that the victim had previously threatened him with a knife, twenty-four days after the incident occurred.

Detective Zanotelli obtained an arrest warrant for Defendant for second degree murder and obstruction of justice. Defendant was arrested in New Jersey five days later and was eventually brought to Jefferson Parish. Detective Zanotelli spoke with Defendant after his arrest. Before giving a statement, Defendant was advised of and waived his *Miranda* rights. Detective Zanotelli pointed out that the video contradicted Defendant's allegation that Mr. Brown reached into his pocket. Defendant did not ask to speak with him again or provide any additional information.

Defendant's statement given to the police was admitted and published to the jury. In his statement Defendant stated that he met Mr. Brown two years before the May 2019 incident. Defendant said that they used to "chill" and "hang out" at bars together. He explained that he no longer dealt with Mr. Brown because he could not trust him. Defendant explained that people believed Mr. Brown was "ratting on things" to the police. He explained that Mr. Brown told other people that he got "coke" from Defendant and that Defendant sold "bad coke." Earlier in the year, while they were at "Pat's [Club]," Mr. Brown asked Defendant what was going on. Defendant told him, "You're supposed to be my friend. You should tell me what was going on." Mr. Brown responded, "I don't give a f*ck," and Defendant said, "Okay." After this incident, Defendant said he stopped speaking to Mr. Brown and would stay away from him if they were at the same place.

In his statement, Defendant told the detective that on the day of the incident, he went to different bars, including Pat's Club and Cheers, and had drinks. Defendant then went to the Pair of Dice Lounge. He indicated that Mr. Brown was present and that he was with "Duchess," [Kelli McCoy] a bartender that he knew, and other people by the pool tables. He told the detective that his friends, Lisa and Jason Flippin, were also present at the bar. He recalled that "Duchess" came over to him, but he could not remember what she said.

Defendant described that around twenty minutes later, Shawn [Mr. Brown] started "coming at [him] for no reason." Mr. Brown said to Defendant, "I did everything for you." Defendant explained that they were not "in each other's faces" at that time. Defendant relayed that the bartender asked if "he was good," and he confirmed that he was. Defendant said he had "seen that look before" when another person stabbed him. Defendant recalled that he went for his drink. He said Mr. Brown came back over and said, "Motherf*cker." Defendant indicated that while Mr. Brown was yelling at him, he told him to "chill" and get away from him. Defendant explained that he stepped back and that Mr. Brown did not come any closer. He said that Mr. Brown's hands were at his side, and he went "in his pocket." He recalled that Mr. Brown said, "Motherf*cker, you want a piece of me, you want a piece of me motherf*cker, I'll kill you, I'll f*cking kill you." Defendant stated that Mr. Brown said this twice to him and then got closer.

Defendant told the detective that "Duchess" told Mr. Brown to get away from him. Defendant stated that when "Duchess" came over, Mr. Brown came towards him and that Mr. Brown's hands were down. He indicated that Mr. Brown tried to push "Duchess," and she was trying to calm him and stop him. He explained that he saw Mr. Brown "go in his pocket." Defendant said he "just took out my sh*t." Defendant stated that he did not even know he hit Mr. Brown until he fell. Defendant explained that his 9 millimeter gun was located on his hip under

his shirt. Defendant remembered telling Mr. Brown to leave him alone and that he did not want to hurt Mr. Brown. He denied showing Mr. Brown the gun. Defendant said that when Mr. Brown came again for a third time, he pulled out his gun and fired. He stated that he only fired once and that he was mad. Defendant recalled that after the shooting, he left out the front door. He explained that he panicked and his friend picked him up after her left the bar. He stated that he threw the gun "in a hole behind the Brother's." Defendant said he left because he wanted to see his son and let his family know what was happening.

Defendant was convicted by a unanimous jury of the lesser offense of manslaughter and of the charged offense of obstruction of justice. On November 12, 2022, Defendant filed a pre-sentencing memorandum. He asserted that his criminal record shows arrests for minor infractions like disorderly conduct, criminal mischief, and possession of marijuana. He stated that after moving to New Orleans in 2017, he was charged with theft and simple assault. He explained that these charges were dropped because the investigation revealed he had been stabbed by Mr. Derek Savoie. He averred that in the instant case, an aggressive Mr. Brown confronted him and mouthed the words "I will kill you." Defendant explained that he shot Mr. Brown in response. He requested that the trial court recognize that he was threatened by Mr. Brown, although his actions were out of proportion to the threat he faced. Defendant also requested that the court recognize his "overreaction" was caused by trauma from a previous stabbing. He asked the trial court to consider that he was a "church member, a hard worker, a loving son, a committed father, and a man who has never sought out to harm anyone in his life prior to the shooting in this case."

At the February 10, 2022 sentencing hearing, the defense called the Jefferson Parish Correctional Center chaplain, Reverend Kathy Radke-Story, to make a statement on Defendant's behalf. She stated that Defendant came to the

church services weekly and became an assistant to her. She was "very surprised" when she subsequently learned about Defendant's charges in the newspaper. Reverend Radke-Story, who has only ever testified on one other individual's behalf, opined that Defendant seemed to attend the services for the "right reasons" and was sincere in his commitment to make himself better. The trial judge informed defense counsel that he would not hold the sentencing open for testimony from an unavailable witness and noted defense counsel's objection.

Thereafter, Defendant apologized to the family and stated, "[H]opefully one day ya'll [sic] can forgive me for hurting—for hurting your family[.]" He lamented that people make mistakes, he could not take back what happened, and he could only move forward. Defendant stated that he had been in jail over thirty-two months and that it was "hard to survive." During his time in jail, Defendant declared that he had been rehabilitated with God's help. He further expressed that since giving his life to God, he has learned to have compassion for others, to forgive, and to love unconditionally. Defendant apologized for taking someone's life, and insisted that he was not a murderer or an average inmate. Defendant also presented the judge with a letter he wrote a few years earlier in order to help others. The trial judge considered the evidence, pointed out Defendant's lack of remorse in his statement to law enforcement following his arrest, and sentenced Defendant to thirty-five years imprisonment on the manslaughter charge, to be served concurrently with a twenty-five year sentence imposed for his obstruction of justice conviction.

On January 12, 2022, defense counsel filed a Motion and Incorporated Memorandum for New Trial and a Motion for Post-Verdict Judgment of Acquittal. Defendant's motion for new trial was based on La. C.Cr.P. art. 851(B)(1), (2), and (5). He asserted that the State did not prove all of the elements of the crimes and that the verdict was contrary to the law and evidence. Defendant also argued that

the court's ruling on Mr. Brown's prior bad acts showed prejudicial error and that the ends of justice would be served by the granting of a new trial. In the motion for post-verdict judgment of acquittal, Defendant argued that the evidence was insufficient to support the conviction of manslaughter in violation of La. R.S. 14:31. At the hearing on January 13, 2022, after the State made brief arguments, the district court denied the motions.

## ASSIGNMENTS OF ERROR

First, Defendant argues that the trial court erred in denying the defense's motions for new trial and post-verdict judgment of acquittal because the evidence was insufficient to support a conviction of manslaughter. He asserts that the issue is whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could find all reasonable hypotheses of innocence were excluded. Defendant maintains that the only question in this case is whether he "felt threatened to the point that he had to stand his ground in self-defense and fire a single shot at Mr. Brown who, he alleges threatened him with a knife, and had more than double the level of cocaine in his system that would normally cause impairment and an emergency room visit."

Defendant further contends that he proved he had a reasonable belief that his life was in imminent danger of death or serious harm. The evidence presented established that he had been stabbed a year and a half earlier by "an associate of Mr. Brown." The evidence also showed that Mr. Brown, who was carrying a knife and who was highly impaired that night, initiated the confrontation by aggressively approaching Defendant in the lounge. He argues that, although he provided the names of several witnesses, including "Lisa" and Mr. Flippin, who could corroborate his story, the police did not find those witnesses. He argues that, although, he initially fled the scene, he freely provided his statement to the police, and he maintained that he shot Mr. Brown in self-defense. Defendant maintains

that the evidence showed that this was a justifiable homicide and that he acted in self-defense.

The State responds that the record does not reflect that Defendant objected to the responsive verdict of manslaughter prior to the jury rendering its verdict. As such, the State argues that because it presented sufficient evidence to support a conviction for second degree murder, any challenge by Defendant to his manslaughter conviction is without merit.

Also, to the extent Defendant argues that no rational jury could have found he did not act in self-defense, the State counters that Defendant's argument is meritless based on the facts of the case. The State contends that based upon the range from which the shot was fired, the location of the gunshot wound sustained by Mr. Brown, and the type of ammunition used, Defendant's specific intent to kill Mr. Brown was established beyond a reasonable doubt. The State avers that it also presented evidence to prove Defendant's action was not justified beyond a reasonable doubt. Specifically, the State points out that the testimony of witnesses, corroborated by the surveillance video from the lounge, proved deadly force was not necessary during the encounter. The State also argues that Defendant's actions following the shooting and his self-serving statement were inconsistent with a defense of justification.

In his second assignment of error, Defendant argues that his thirty-five year sentence for his manslaughter conviction is excessive. Defendant emphasizes his age, lack of violent criminal history, and the fact that he acted in self-defense. He complains that the district court failed to justify why the minimum sentence was not given in this case. He further claims that the district court discounted his remorse shown at sentencing and the positive changes he has made while incarcerated. He avers that excessive sentences do nothing for any legitimate state or community interest.

The State counters that, in sentencing Defendant on his conviction of manslaughter, the district court considered the facts of this case, the mitigating factors presented by Defendant, the victim impact statements, the pre-sentence investigation report, and Defendant's lack of remorse. The State further argues that in comparing the instant case to analogous cases, Defendant has not made a sufficient showing of abuse of discretion.

## *LAW AND DISCUSSION*

<u>Assignment of Error One – Sufficiency of the Evidence</u>

In reviewing the sufficiency of the evidence, an appellate court must determine if the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Lane*, 20-181 (La. App. 5 Cir. 1/27/21), 310 So.3d 794, 804. This directive that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing. *State v. Clifton*, 17-538 (La. App. 5 Cir. 5/23/18), 248 So.3d 691, 702. This deference to the fact-finder does not permit a reviewing court to decide whether it believes a witness or whether the conviction is contrary to the weight of the evidence. *State v. Caffrey*, 08-717 (La. App. 5 Cir. 5/12/09), 15 So.3d 198, 202, *writ denied*, 09-1305 (La. 2/5/10), 27 So.3d 297.

The resolution of conflicting testimony rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *State v. Bailey*, 04-85 (La. App. 5 Cir. 5/26/04), 875 So.2d 949, 955, *writ denied*, 04-1605 (La. 11/15/04), 887 So.2d 476, *cert. denied*, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). Thus, in the absence of internal contradiction or irreconcilable

conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *State v. McKinney*, 304 So.3d at 1103 (citing *State v. Dixon*, 07-915 (La. App. 5 Cir. 3/11/08), 982 So.2d 146, 153, *writ denied sub nom. State ex rel. Dixon v. State*, 08-987 (La. 1/30/09), 999 So.2d 745).

Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. *State v. Gatson*, 21-156 (La. App. 5 Cir. 12/29/21), 334 So.3d 1021, 1034 (citing to *State v. Williams*, 05-59 (La. App. 5 Cir. 5/31/05), 904 So.2d 830, 833). When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 provides that assuming every fact to be proved that the evidence tends to prove, "in order to convict, it must exclude every reasonable hypothesis of innocence." *State v. Wooten*, 99-181 (La. App. 5 Cir. 6/1/99), 738 So.2d 672, 675, *writ denied*, 99-2057 (La. 1/14/00), 753 So.2d 208. This is not a separate test from the *Jackson* standard but rather provides a helpful basis for determining the existence of reasonable doubt. *Id.*

The motion for a new trial is based on the supposition that injustice has been done to the defendant, and unless such is shown to have been the case, the motion shall be denied, no matter upon what allegations it is grounded. La. C.Cr.P. art. 851(A). On motion of the defendant, the court shall grant a new trial whenever the verdict is contrary to the law and the evidence. La. C.Cr.P. art. 851(B)(1). When a motion for a new trial is based on the verdict being contrary to the law and the evidence, there is nothing to review on appeal. *State v. Condley*, 04-1349 (La. App. 5 Cir. 5/31/05), 904 So.2d 881, 888, *writ denied*, 05-1760 (La. 2/10/06), 924 So.2d 163. However, both the Louisiana Supreme Court and this Court have addressed the constitutional issue of the sufficiency of the evidence under this circumstance.

*Id.* With respect to defendant's claim that the "ends of justice" would be served by a new trial, this Court has previously held that such a claim presents nothing for appellate review. *See State v. Daniels*, 15-78 (La. App. 5 Cir. 9/23/15), 176 So.3d 735, 740, *writ denied*, 15-1997 (La. 11/29/16), 211 So.3d 386. The decision on a motion for a new trial rests within the sound discretion of the trial judge, and his ruling will not be disturbed on appeal absent a clear showing of an abuse of discretion. *State v. Mouton*, 16-673 (La. App. 5 Cir. 4/26/17), 219 So.3d 1244, 1254, *writ denied*, 17-1149 (La. 5/18/18), 242 So.3d 572.

Defendant also filed a Motion for Post-Verdict Judgment of Acquittal. The question of sufficiency of the evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal pursuant to La. C.Cr.P. art. 821. *Mouton*, *supra*; *State v. Bazley*, 09-358 (La. App. 5 Cir. 1/11/11), 60 So.3d 7, 18, *writ denied*, 11-282 (La. 6/17/11), 63 So.3d 1039. A post-verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the State, does not reasonably permit a finding of guilty. *State v. Durand*, 07-4 (La. App. 5 Cir. 6/26/07), 963 So.2d 1028, 1033, *writ denied*, 07-1545 (La. 1/25/08), 973 So.2d 753. Appellate review of the denial of the motion for post-verdict judgment of acquittal is controlled by the standards set forth in *Jackson v. Virginia*, *supra*.

In the instant case, the testimony and evidence presented at trial established that, on the day of the shooting, the victim, Mr. Brown was at the Pair of Dice Lounge with his friends, Mr. Ronald Ruiz, Ms. Monica Sonia, and Ms. Kelli McCoy, who were also Defendant's friends. Defendant arrived thereafter with his friends, Lisa and Jason Flippin. Defendant and Mr. Brown were friends who had "a falling out" a few months earlier, but they both continued to frequent the same bars afterwards. The State demonstrated that before the shooting, Ms. McCoy and Defendant had an argument because Defendant's friend, Mr. Flippin, called Mr.

Brown "a cop." Ms. McCoy stated that Defendant was upset that she was "hanging out" with Mr. Brown. Shortly after this exchange, Mr. Ruiz left his seat by Mr. Brown, and approached Defendant and his friends, who were on the other side of the bar. At that point, Mr. Brown also walked over to Defendant, and they had an argument.

Ms. McCoy heard their entire argument, and she explained that Mr. Brown said they should go outside and fight. Ms. Monica Sonia also testified that she heard Mr. Brown say, "Hey, man, I'm tired of this, you know, we grown a** men. And we'll go outside and fight, fight it out like men instead of just, you know, going back and forth bickering all the time." Ms. McCoy explained that Mr. Ruiz initially got between Mr. Brown and Defendant, so she walked over to the group because it seemed that they were "getting heated." Ms. McCoy further explained that she told Mr. Brown to stop and to sit down. She testified that she could be seen grabbing Defendant's arm and trying to push him back. She recalled that she saw the firearm, told Defendant "no," and ducked down as Defendant shot Mr. Brown.

The witnesses denied that Mr. Brown pulled out a weapon or hit Defendant. Ms. McCoy also denied hearing Mr. Brown threaten to kill Defendant during their argument. Detectives Buttone and Zanotelli both testified that they reviewed the surveillance video taken from the lounge. Detective Buttone indicated that the camera angles showed nothing in Mr. Brown's hands during the incident, and Detective Zanotelli also denied seeing him with a weapon in his hands or reaching into his pockets for the pocketknife, found later during the autopsy.

Also, the surveillance video from the lounge, which did not have sound, largely corroborated the witnesses' testimony. The video showed that Mr. Brown walked over to Defendant, the two had a verbal altercation, and Mr. Brown walked away. The video also showed that after Mr. Brown walked back towards Defendant, Mr. Ruiz stepped between the two, and then Ms. McCoy walked over.

The surveillance video showed that Ms. McCoy pushed Mr. Brown backward into a railing, and Defendant stepped around Mr. Ruiz afterwards. The video reflected that Ms. McCoy had her hands placed on the men's chests. In the video, Mr. Brown's hands were at his side, and Defendant could be seen pulling on Ms. McCoy's arm. The video showed that when Ms. McCoy ducked down, Defendant shot Mr. Brown in the left side of his face, and Mr. Brown fell to the ground. The testimony and evidence established that after the shooting, Defendant fled from the scene, discarded his weapon at a gas station, and left for New Jersey, where he was later apprehended.

The testimony also established that other witnesses present fled the scene after the shooting. Detective Buttone and Mr. Zanotelli both testified that they searched for but could not locate Mr. Flippin, and they were unable to determine the identity of "Lisa." Also, besides providing a statement the night of the shooting, the bartender failed to cooperate with the police.

The defense argued that Defendant killed Mr. Brown in self-defense, and that Mr. Brown had a knife and was the aggressor. Although Defendant did not testify, his statement was played for the jury at trial. Defendant claimed that he shot the victim because he was previously stabbed by Mr. Savoie after Mr. Savoie threatened Defendant. He said that Mr. Brown and Mr. Savoie were friends. The defense also introduced photographs of Defendant's scars into evidence. Defendant knew Mr. Brown kept a gun in his truck and had a pocketknife. Defendant repeatedly told the detective that Mr. Brown threatened to kill him and that he saw Mr. Brown go into his pocket. During his statement, Defendant alleged that he "blacked out," did not know that he hit Mr. Brown until he fell, and he denied remembering that the shooting occurred. He further alleged that he pulled the gun out and fired right away.

Defense counsel questioned Ms. McCoy about Defendant's prior stabbing at trial. She confirmed that she was present the night Mr. Savoie and Defendant had an argument. Ms. McCoy testified that in September 2017, Mr. Savoie injured Defendant with a pen and that Defendant went to the hospital afterwards. However, she denied that Mr. Brown knew Mr. Savoie or that they were friends. She further denied that Mr. Savoie was present at the lounge the morning Mr. Brown was shot. None of the witnesses testified that they heard Mr. Brown threaten to kill Defendant. Some witnesses testified that they only heard him tell Defendant that they should go outside, which they believed meant that Mr. Brown wanted to fist fight. Witnesses also denied that they saw Mr. Brown with a knife or that he pulled a knife out of his pocket. Furthermore, the detectives testified that they reviewed the surveillance video and Mr. Brown did not have anything in his hands during the incident. The jury heard this conflicting testimony and evidently found the State's witnesses' descriptions of what had occurred during the early morning hours of May 25, 2019, at the Pair of Dice Lounge more credible. The credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; therefore, the credibility of witnesses will not be reweighed on appeal. *State v. Macon*, 06-481 (La. 6/1/07), 957 So.2d 1280, 1285-86; *State v. Rowan*, 97-21 (La. App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.

Although evidence was presented regarding Defendant's violent encounter with Mr. Savoie, the testimony of other witnesses did not corroborate Defendant's claim that Mr. Savoie and Mr. Brown were friends. Defendant also admitted that he fled the scene after the shooting. Defendant's flight from the scene after the shooting could be viewed as inconsistent with a theory of justifiable homicide. *See State v. Wallace*, 612 So.2d 183, 191 (La. App. 1st Cir. 1992), *writ denied*, 614 So.2d 1253 (La. 1993). A defendant's flight and attempt to avoid apprehension are

circumstances from which a trier of fact may infer a guilty conscience. *State v. Cazenave*, 00-183 (La. App. 5 Cir. 10/31/00), 772 So.2d 854, 860, *writ denied*, 00-3297 (La. 10/26/01), 799 So.2d 1151.

Based on the foregoing, we find that the evidence presented by the State was sufficient to support the jury's finding that Defendant committed manslaughter and that the killing of Mr. Brown was not a justifiable homicide. La. R.S. 14:30.1 defines second degree murder as the killing of a human being when the offender: 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even though he has no intent to kill or inflict great bodily harm. *State v. Lewis*, 05-170 (La. App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, *writ denied*, 06-757 (La. 12/15/06), 944 So.2d 1277. The written jury charges instructed the jury regarding specific intent manslaughter as well. The offense of manslaughter is defined as a homicide that would be first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that even an average person's blood would have cooled, at the time the offense was committed. La. R.S. 14:31(A)(1). Manslaughter is a responsive verdict for second degree murder. La. C.Cr.P. art. 814(A)(3).

When a defendant does not object to a legislatively responsive verdict, the defendant's conviction will not be reversed, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged. *State ex rel. Elaire v. Blackburn*, 424 So.2d 246, 252 (La. 1982), *cert. denied sub nom. Elaire v. Blackburn*, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983); *State v. Austin*, 04-993 (La. App. 5 Cir. 3/1/05), 900 So.2d

867, 878, *writ denied*, 05-830 (La. 11/28/05), 916 So.2d 143. Defendant did not object to the responsive verdict of manslaughter at trial.

When a defendant in a homicide prosecution claims self-defense, the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Reed*, 11-507 (La. App. 5 Cir. 2/14/12), 88 So.3d 601, 607, *writ denied*, 12-644 (La. 9/14/12), 97 So.3d 1014. The relevant inquiry on appeal is whether a rational fact-finder, after viewing the evidence in the light most favorable to the prosecution, could have found, beyond a reasonable doubt, that the homicide was not committed in self-defense. *State v. Cassard*, 01-931 (La. App. 5 Cir. 2/26/02), 811 So.2d 1071, 1076, *writ denied*, 02-917 (La. 12/19/02), 833 So.2d 327.

A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La. R.S. 14:20(A)(1). The fact that an offender's conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct. La. R.S. 14:18; *State v. Sparkman*, 13-640 (La. App. 5 Cir. 2/12/14), 136 So.3d 98, 106, *writ denied*, 14-477 (La. 11/26/14), 152 So.3d 897.

It is well established that the aggressor or the person who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. *See* La. R.S. 14:21; *State v. Howard*, 15-473 (La. App. 5 Cir. 12/9/15), 182 So.3d 360, 363. While there is no unqualified duty to retreat, the possibility of escape from an altercation is a recognized factor in determining whether the defendant had a reasonable belief that deadly force was necessary to avoid the danger. *State v. King*, 11-767 (La.

App. 5 Cir. 2/28/12), 88 So.3d 1147, 1153, *writ denied*, 12-660 (La. 9/14/12), 99 So.3d 35.

Other factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. *State v. Lensey*, 50,242 (La. App. 2 Cir. 11/18/15), 182 So.3d 1059, 1062, *writ denied*, 15-2344 (La. 3/14/16), 189 So.3d 1066. The determination of a defendant's culpability rests on a two-fold test: 1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger; and 2) whether deadly force was necessary to prevent the danger. *State v. Sinceno*, 12-118 (La. App. 5 Cir. 7/31/12), 99 So.3d 712, 719, *writ denied sub nom. State ex rel. Sinceno v. State,* 12-2024 (La. 1/25/13), 105 So.3d 713. The fact-finder determines whether the State negated self-defense beyond a reasonable doubt. *State v. Griffin*, 14-450 (La. App. 5 Cir. 12/16/14), 167 So.3d 31, 38, *writ denied*, 15-148 (La. 11/20/15), 180 So.3d 315.

Defendant's theory of self-defense was presented to the jury during the trial. After listening to the testimony and considering the evidence, the jury rejected defendant's theory that the homicide in this case was justified and found defendant guilty of the lesser offense of manslaughter. The fact-finder must make the ultimate decision in determining whether a defendant proved his condition and whether the State negated the defense beyond a reasonable doubt. *State v. Hyman*, 09-409 (La. App. 5 Cir. 2/9/10), 33 So.3d 271, 278, *writ denied*, 10-548 (La. 10/1/10), 45 So.3d 1094.

Viewing the evidence in the light most favorable to the prosecution, we find that the record supports the jury's conclusion that Defendant did not reasonably believe his life to be imminent danger and that deadly force was necessary to

prevent the danger. The testimony of the witnesses who knew both Defendant and the victim was that they both continued to frequent the same bars and lounges. Also witnesses opined that Mr. Brown wished to resolve their conflict by going outside and "fighting it out like men." No one overheard Mr. Brown threaten Defendant's life, as Defendant claimed. No witness saw Mr. Brown attempt to pull out his pocketknife. Detectives investigating the crime confirmed that the surveillance video showed that Mr. Brown did not have a weapon in his hand at the time of the shooting, though a pocketknife was found in his pants pocket during the autopsy. Defendant and Mr. Brown's mutual friends were also actively trying to de-escalate the conflict between the two men before the shooting. Thus, we find that the State provided sufficient evidence under the *Jackson* standard for the jury to find that it proved beyond a reasonable doubt that Defendant did not kill Mr. Brown in self-defense.

Assignment of Error Two - Constitutionally Excessive Sentence

The Eighth Amendment to the U.S. Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. *State v. Calloway*, 19-335 (La. App. 5 Cir. 12/30/19), 286 So.3d 1275, 1279, *writ denied*, 20-266 (La. 7/24/20), 299 So.3d 69; *State v. Nguyen*, 06-969 (La. App. 5 Cir. 4/24/07), 958 So.2d 61, 64, *writ denied*, 07-1161 (La. 12/7/07), 969 So.2d 628. A sentence is considered excessive, even if it is within the statutory limits, if it is grossly disproportionate to the severity of the offense or imposes needless and purposeless pain and suffering. *State v. Woods*, 18-413 (La. App. 5 Cir. 12/19/18), 262 So.3d 455, 460; *Nguyen*, *supra*.

In reviewing a trial court's sentencing discretion, three factors are considered: 1) the nature of the crime; 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the same court and other courts. *Woods*, *supra*; *State v. Allen*, 03-1205 (La. App. 5 Cir. 2/23/04), 868

So.2d 877, 880. However, there is no requirement that specific matters be given any particular weight at sentencing. *Woods*, 262 So.3d at 460-61.

According to La. C.Cr.P. art. 881.4(D), the appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. In reviewing a sentence for excessiveness, the reviewing court shall consider the crime and the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the court's sense of justice, while recognizing the trial court's wide discretion. *Calloway*, *supra*; *State v. Taylor*, 06-839 (La. App. 5 Cir. 3/13/07), 956 So.2d 25, 27 (citing *State v. Lobato*, 603 So.2d 739, 751 (La. 1992)). The relevant question on appeal is whether the trial court abused its broad sentencing discretion not whether another sentence might have been more appropriate. *See State v. Dixon*, 19-7 (La. App. 5 Cir. 12/30/19), 289 So.3d 170, 174, *writ denied*, 20-143 (La. 7/17/20), 298 So.3d 176.

As previously mentioned, Defendant only challenges the constitutional excessiveness of his sentence for his manslaughter conviction, not his sentence for the obstruction of justice conviction. Here, Defendant was originally charged with second degree murder but was convicted by a jury of the lesser offense of manslaughter. At the time of the offense, the penalty for manslaughter under La. R.S. 14:31 provided in pertinent part, "[w]hoever commits manslaughter shall be imprisoned at hard labor for not more than forty years." The record reflects that at the February 10, 2022 sentencing hearing, the trial court imposed a term of imprisonment of thirty-five years at hard labor for his manslaughter conviction. Therefore, Defendant's thirty-five-year sentence is within the statutory range.

Prior to sentencing, the trial judge explained that he took into consideration the pre-sentencing investigation report (PSI), the testimony from the witnesses, Defendant's statement, and the victim impact statement. The trial judge was "struck by the fact that [Defendant] gave a very lengthy recorded statement to the

police once he was brought back after being arrested by the U.S. Marshals in New Jersey and never did express any kind of sympathy or remorse during that time." The judge also noted that prior to sentencing, he gave great consideration to the PSI report, in which Defendant did not express remorse. Defendant argues that the trial court improperly focused on the fact that he failed to show remorse in his statement to the police. He maintains that the district court discounted his remorse shown to the court at sentencing and the many positive changes and actions he has made while incarcerated.

Although the district court stressed that Defendant did not show any remorse for committing the instant offense in his statement to the detective, the record reflects that the trial court also considered Defendant's statement to the court at his sentencing—where Defendant expressed his remorse. Nonetheless, a trial court is not prohibited from considering a defendant's lack of remorse *See State v. Bartholomew*, 18-670 (La. App. 5 Cir. 10/23/19), 282 So.3d 374, 385, *writ not considered*, 19-1869 (La. 1/28/20), 288 So.3d 123; *State v. L.A.C.*, 07-1411 (La. App. 3 Cir. 4/30/08), 982 So.2d 277, 279.

Finally, with respect to Defendant's thirty-five-year sentence, the jurisprudence reflects that comparable sentences have been imposed for manslaughter convictions under similar circumstances. In *Hyman*, 45 So.3d at 1094, this Court found the trial court did not abuse its broad discretion in imposing a forty-year sentence on the defendant who was initially charged with second degree murder, but was ultimately convicted of manslaughter. At sentencing, the trial court stated that the defendant, like Defendant in this case, created a risk to more than one person by shooting the victim in the manner he did, and that any lesser sentence would deprecate the seriousness of the offense. On appeal, we found that the record revealed sufficient evidence to support a conviction for second degree murder. Further, as in the instant case, the defendant in that case had

an opportunity to withdraw from the confrontation, but chose not to, and the trial court found that the defendant was not acting in self-defense.

Also, in *State v. Pham*, 12-635 (La. App. 5 Cir. 5/16/13), 119 So.3d 202, *writ denied*, 13-1398 (La. 12/6/13), 129 So.3d 531, the defendant was charged with second degree murder and convicted of manslaughter. On appeal, the defendant argued that his sentence of thirty-five years imprisonment for manslaughter was excessive. *Id*. at 222. The trial court properly considered a family member's impact statement, the fact that the defendant was found guilty of the responsive verdict of manslaughter, and the sentencing guidelines set forth under La. C.Cr.P. art. 894.1. The trial court also stated that the offense was a crime of violence committed with a dangerous weapon, where endangerment to human life was foreseeable and from which the victim's family suffered permanent injury. The trial court considered the mitigating factors, including the defendant's young age and absence of a criminal record, but, based on the testimony presented at trial which disproved the defendant's theory of self-defense, found the crime to be senseless. This Court found that the trial court did not err in denying the defendant's motion to reconsider sentence, finding that the sentence imposed for the defendant's manslaughter conviction was not constitutionally excessive. *Id*. at 225-27.

In *State v. Parker*, 54,190 (La. App. 2 Cir. 3/9/22), 335 So.3d 519, the defendant was sentenced to thirty-six years imprisonment at hard labor after he pled guilty to manslaughter. The defendant asserted that the trial court should have considered that he was young and immature, he had only one misdemeanor conviction, he had some work history, and he took responsibility for his actions. *Id*. at 524. The second circuit found that given the heinous and senseless nature of the violent offense, the defendant's attempts to avoid responsibility for his actions, and the benefit he received from his favorable plea agreement, the sentence was not

grossly disproportionate to the seriousness of the offense, and it did not shock one's sense of justice. *Id*. at 526. In *State v. Angelle*, 13-508 (La. App. 3 Cir. 11/6/13), 124 So.3d 1247, *writ denied*, 13-2845 (La. 5/23/14), 140 So.3d 724, *and writ denied sub nom. State ex rel. Angelle v. State*, 13-2892 (La. 8/25/14), 147 So.3d 693, the third circuit found that the maximum sentence of forty years imprisonment imposed upon the defendant who pled guilty was not excessive. In that case, the third circuit stated that while the defendant was a first-time offender and expressed some remorse, the evidence indicated that the defendant walked into a bar and killed the victim "in cold blood." The third circuit found that evidence was sufficient to support a conviction of second degree murder and the defendant received the benefit of pleading to the reduced crime of manslaughter, thereby avoiding the more severe penalty of life imprisonment without the benefit of probation, parole, or suspension of sentence that comes with a second degree murder conviction. *Id*. at 1252-53.

In this case, the evidence adduced at trial could have supported a second degree murder conviction and the exposure to a mandatory life sentence under La. R.S. 14:30.1. "In considering the nature of the offense, both the trial court and reviewing court may assess whether the crime for which defendant has been convicted adequately describes his conduct when the conviction is for a lesser included responsive offense to the crime charged." *State v. Lewis*, 09-1404 (La. 10/22/10), 48 So.3d 1073, 1078 (citing *State v. Lanclos*, 419 So.2d 475, 478 (La. 1982)). This general sentencing principle accommodates Louisiana's responsive verdict scheme which provides the fact-finder, ordinarily a jury in felony cases, the discretion to return verdicts for lesser-included offenses against the weight of the evidence presented at trial. *Lewis*, 48 So.3d at 1078 (citing *State v. Porter*, 93-1106 (La. 7/5/94), 639 So.2d 1137, 1140). Louisiana courts have found the fact that the evidence might have supported a verdict of second degree murder is an appropriate

sentencing consideration where the defendant has been convicted of a lesser offense. *See Lewis*, *supra*; *State v. Angelle*, 124 So.3d at 1252.

After considering the seriousness of the crime committed in this case, for which Defendant could have been convicted of second degree murder, we find the thirty-five-year sentence imposed with respect to Defendant's manslaughter conviction is not constitutionally excessive. Therefore, we find that the district court did not abuse its discretion in sentencing Defendant to thirty-five years imprisonment for the crime of manslaughter.

Errors Patent

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990). The Uniform Commitment Order ("UCO") states that Defendant was charged with manslaughter on count one. However, the transcript reflects that Defendant was charged with second degree murder in violation of La. R.S. 14:30.1 and was found guilty of the lesser offense of manslaughter in violation of La. R.S. 14:31. Accordingly, we remand this matter for correction of the UCO and direct the Clerk of Court for the 24th Judicial District Court to transmit the original of the corrected UCO to the appropriate authorities and the Department of Corrections' legal department. *See State v. Ramos*, 20-239 (La. App. 5 Cir. 1/27/21), 310 So.3d 826.

Also, the sentencing minute entry indicates that Defendant was advised that he had "two (2) years after judgment of conviction and sentence has become final to seek post-conviction relief." However, a review of the transcript of the proceedings on February 10, 2022, reveals that the trial judge did not advise Defendant of the prescriptive period for filing post-conviction relief after his sentencing. The transcript generally prevails. *State v. Lynch*, 441 So.2d 732, 734 (La. 1983).

If the trial court fails to advise, or provides an incomplete advisal, pursuant to La. C.Cr.P. art. 930.8, the appellate court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief by means of its opinion. *See State v. Perez*, 17-119 (La. App. 5 Cir. 8/30/17), 227 So.3d 864, 870. Therefore, we advise Defendant that no application for post-conviction relief, including applications that seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.

## *DECREE*

Considering the foregoing, Defendant's conviction of manslaughter in violation of La. R.S. 14:31 and sentence of thirty-five years imprisonment are affirmed. The matter is remanded for correction of the UCO as directed by this opinion.

**AFFIRMED;**
**REMANDED FOR CORRECTION OF UCO**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
INTERIM CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**DECEMBER 28, 2022** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**22-KA-194**

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE STEPHEN D. ENRIGHT, JR. (DISTRICT JUDGE)
ANDREA F. LONG (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          JANE L. BEEBE (APPELLANT)

### MAILED
BRITTANY BECKNER (APPELLEE)
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
BRITTANY BECKNER (APPELLEE)
ASSISTANT DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053